**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| EAST GATE-LOGISTICS PARK CHICAGO, LLC and NORTHPOINT DEVELOPMENT, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:24-cv-3742 |
| v. | ) ) | |
| CENTERPOINT PROPERTIES TRUST; CENTERPOINT JOLIET TERMINAL RAILROAD, LLC; and HOUBOLT ROAD EXTENSION JV, LLC, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiffs East Gate-Logistics Park Chicago, LLC ("East Gate") and NorthPoint Development, LLC ("NorthPoint"), by and through their attorneys, bring this action against Defendants CenterPoint Properties Trust ("CPT"), CenterPoint Joliet Terminal Railroad, LLC ("CJTR"), and Houbolt Road Extension JV, LLC ("HRE"), and allege as follows:

**SUMMARY OF THE CASE**

1.      Access to warehouse space is vital for businesses that ship freight across the United States. This is especially true near "intermodal terminals," where freight is transferred from one mode of transport to another. Freight moving between modes of transportation often must be stored, repackaged, broken up, and/or combined with other products in warehouses and distribution facilities before being sent on to the

final destination. As a result, warehouse users receiving goods via an intermodal seek out and will pay more for space in warehouses and distribution facilities that are in close proximity to an intermodal terminal.

2.     This lawsuit concerns efforts to monopolize and block competitors from entering the market for commercial warehouse space in and around two of the largest intermodal terminals in the United States through the collusive actions of related parties to enforce an unreasonable restraint of trade against an ascendant competitor. For almost two decades, Defendants CJTR and CPT (together, "CenterPoint") dominated the commercial warehouse and distribution facility market surrounding the United States' largest in-land port, the BNSF Logistics Park Chicago ("LPC"), and the Union Pacific's intermodal facility, the Joliet Intermodal Terminal ("JIT"). Located less than five miles apart, these two facilities represent the eastern terminus for goods arriving in shipping containers by rail from all major West Coast ports and are "the epicenter of the region's immense transportation infrastructure."[1] In total, the freight that passes through the LPC and JIT (together, the "Joliet Intermodal Zone") accounts for approximately 3-4% of U.S. GDP.

3.     CenterPoint is the dominant supplier of warehouse space in the Joliet Intermodal Zone. Beginning in the early 2000s, CenterPoint began acquiring land parcels in the Joliet Intermodal Zone, eventually developing them into the sprawling CenterPoint Intermodal Center – Joliet/Elwood, "America's largest master-planned

---

[1] Website for Centerpoint Intermodal Center – Joliet/Elwood, https://cicjolietelwood.com/ ("The park is at the epicenter of the region's immense transportation infrastructure, located adjacent to the I-55 / I-80 interchange and anchored by the BNSF Logistics Park Chicago and the Union Pacific Joliet Intermodal Terminal.") (last accessed April 20, 2024).

55925278.1

inland port."[2] The facility is a 6,400-acre intermodal complex comprising much of the Joliet Intermodal Zone, with 50+ tenants in warehouses covering some 17 million square feet.[3] CenterPoint touts the fact that its facilities "surround" both the Union Pacific's JIT and the BNSF's LPC, thereby "making [the CenterPoint Intermodal Center – Joliet/Elwood] one of the most desirable intermodal locations in the U.S."[4]

4.    CenterPoint's monopoly in the market for warehouse space in the Joliet Intermodal Zone has meant higher prices and lower quality services for warehouse users and their customers.

5.    In 2013, Plaintiff NorthPoint (and later East Gate) saw an opportunity to bring competition to the warehouse market and to disrupt CenterPoint's monopoly. In the following years, East Gate and its affiliates acquired thousands of acres of land for a competing warehouse project and obtained entitlements from various governing jurisdictions (primarily the City of Joliet) to allow that project to move forward. Of critical importance to many warehouse users in the Joliet Intermodal Zone, the East Gate project's infrastructure was all designed to accommodate trucks carrying "heavy weight" loads, *i.e.,* those for which the total weight of the truck and shipping container exceeds 80,000 lbs.

6.    Up to present, East Gate (directly and through its wholly-owned subsidiaries) has invested hundreds of millions of dollars into its project, has acquired approximately 3,200 acres, which could support approximately 40 million square feet

---

[2] *Id.*
[3] *Id.*
[4] Website for Centerpoint Intermodal Center – Joliet/Elwood, "Intermodal Providers," https://cicjolietelwood.com/intermodal-providers/

55925278.1

of warehouse space, to compete with CenterPoint's warehouse facilities, and is in the process of completing the construction of three warehouse buildings comprising approximately 3.4 million square feet. If these warehouses are connected to the rest of the Joliet Intermodal Zone by direct, truck-accessible, public roadways, East Gate will be able to compete with CenterPoint for tenants who want or need to establish warehouse or distribution centers adjacent to the intermodals.

7.      CenterPoint learned of East Gate's intention to enter the market by early 2016. To protect its monopoly, CenterPoint embarked on a plan to block East Gate's entry, knowing that East Gate presented the most serious threat to CenterPoint's control over the market.

8.      CenterPoint's plan was to block competition through the use of an agreement to build a toll bridge over the Des Plaines River that would connect CenterPoint's warehouses with the closest interstate highway (the "Houbolt Road Toll Bridge"). Under this agreement—a Memorandum of Understanding (the "MOU") between CenterPoint and the City of Joliet, the Will County Division of Transportation, and the Illinois Department of Transportation (attached as **Exhibit A**) —CenterPoint agreed to finance the Houbolt Road Toll Bridge. CenterPoint later assigned all of its rights, obligations, interest, and title in the MOU to Defendant HRE.

9.      CenterPoint and HRE have advanced a dangerously anticompetitive interpretation of portions of the MOU—one with far-reaching consequences for East Gate's ability to compete and for competition for warehouse space around the

4

intermodals. According to CenterPoint and HRE, in Section XII.B(3) of the MOU, the City of Joliet and Will County purportedly agreed to give up ***all authority to regulate or modify weight restrictions on roads in and around the Joliet Intermodal Zone for a period of 40 years***.[5] According to CenterPoint and HRE, this restriction can only be removed with CenterPoint and HRE's unilateral consent.

10.    HRE is selectively enforcing Section XII.B(3) of the MOU to prohibit East Gate and its customer's from accessing East Gate's development. HRE is doing so to allow CenterPoint and HRE to block competitors from entering the market by unilaterally prohibiting the City of Joliet from exercising its authority to regulate the weight limits for a road connecting East Gate's warehouses to the intermodals. This course of action has and will continue to have a devastating impact on any developer's ability to offer competitive, convenient, and economical warehouse space in competition with CenterPoint's monopoly in the Joliet Intermodal Zone. Absent the City of Joliet's retention of the right to address and regulate public road usage, including truck traffic for competitor warehouse projects, there is essentially no means to change the "status quo" of CenterPoint's stranglehold over the warehouse real estate market in the Joliet Intermodal Zone. And because of the MOU's 40-year term, it would solidify CenterPoint's monopoly for years.

11.    To compete with CenterPoint, warehouse operators must be able to offer their customers the ability to move freight in and out of warehouses with heavy tractor trailers. This is particularly true for warehouse users moving heavy shipping

---

[5] Pursuant to Section XVI of the MOU, the MOU has a term of 40 years.

55925278.1

containers between the intermodals and a warehouse. Without granting the temporary connection that the Third Coast Intermodal Hub project requires, East Gate's customers would be foreclosed from moving shipping containers to and from their warehouses via a direct, economical, and safe trucking route. Given the vital importance of moving heavy shipping containers between the railyard and the warehouse via direct, economical, and safe routes, many warehouse users will have no choice but to use the more expensive CenterPoint warehouses, thereby further entrenching CenterPoint's monopoly position.

12.     Since the MOU went into effect, the City of Joliet has publicly recognized the importance of allowing East Gate and its customers to use heavy trucks on select, appropriate roadways to encourage investment, job creation, and growth of the overall market and tax base. As a result, the City approved East Gate's plans to enter the warehousing market in the Joliet Intermodal Zone by granting numerous zoning, subdivision, and other land development approvals. As part of these approvals, the City of Joliet agreed to temporarily permit truck access on Millsdale Road leading to East Gate's warehouses, thus allowing East Gate's customers to use tractor trailers to move heavy shipping containers between the intermodals and East Gate's warehouse facilities and decreasing truck traffic on local roads and bridges. The City approvals also included numerous other required traffic improvements for the Third Coast Intermodal Hub project to ensure the efficient and safe flow of traffic in the area.

13.     This should be the end of the story. But it is not. Recognizing East Gate

as a threat to CenterPoint's monopoly position, HRE, which was assigned all right and title in and to the MOU, took legal action to enforce the anticompetitive provisions in the MOU on CenterPoint's behalf by suing the City of Joliet in Will County Circuit Court and seeking an injunction prohibiting, among other things, the City of Joliet permitting East Gate to use its temporary connection to allow trucks.

14.     HRE's stated purpose of that suit was to prohibit the City of Joliet from complying with the express terms of East Gate's city-approved entitlements allowing a temporary access point from East Gate's project on a weight-restricted roadway (Millsdale Road). The purported potential damage to HRE as alleged in that lawsuit is that East Gate's project, with tens of millions of square feet of development and related user activity, would somehow effect a loss of toll revenue for the Houbolt Road Toll Bridge notwithstanding the significant additional truck traffic generated by East Gate's development.

15.     The City of Joliet has opposed and continues to oppose that lawsuit on several grounds, in particular that the MOU did not and could not strip the City of its inherent police power to regulate city roads for the public health, safety, and welfare notwithstanding any purportedly contrary provision of the MOU. Likewise, IDOT also objected to the purported rights CenterPoint and HRE read into the MOU.

16.     On March 19, 2024, the Circuit Court in Will County enforced the anticompetitive provision in Section XII.B(3) the MOU and issued a temporary restraining order enjoining the City of Joliet from, among other things, permitting the use of the temporary access point for the East Gate project.

7

17.    In obtaining this decision, HRE relied on the above-noted false statements concerning "lost tolls" despite the obvious effect of East Gate's development: a significant *increase* in use of the Houbolt Road Toll Bridge as more vehicles would enter and exit the Joliet Intermodal Zone. However, HRE's lawsuit was never about lost tolls or any other genuine commercial need, but rather was a sham undertaken at the direction of, or in concert with CenterPoint to block East Gate's entry into the Joliet Intermodal Zone's warehouse market and preserve CenterPoint's monopoly, with HRE's action under the MOU being the most convenient means for the two parties to act together to achieve CenterPoint's anticompetitive aims.

18.    In conjunction with HRE's lawsuit, CenterPoint also engaged in a misinformation campaign concerning East Gate's Joliet Intermodal Zone development to potential tenants in an attempt to win developments and leases at East Gate's expense. For example, prior to any ruling by the Court, CenterPoint told multiple potential tenants that East Gate lacked tractor-trailer accessible roadways via Millsdale Road between the LPC and JIT and East Gate's warehouses—the essential route for moving freight between East Gate's warehouses and the intermodals.

19.    NorthPoint and East Gate believe they have no choice but to bring this action now in federal court to enjoin and declare invalid Section XII.B(3) of the MOU to protect the hundreds of millions of dollars already invested into the East Gate project (and future profits from that investment and future investments to be made

8

within its project), and to put an end to the unlawful efforts of CenterPoint and HRE to prevent competitors from entering the Joliet Intermodal Zone. Every day that East Gate is forced to compete under the cloud caused by CenterPoint and HRE's anticompetitive action further solidifies CenterPoint's monopoly, and causes harm to warehouse users who rely on competitive prices for the shipping and warehousing of the many billions of dollars of goods traveling through the Joliet Intermodal Zone each year. And given the clear nexus this case has to interstate commerce, application of the federal antitrust laws is appropriate to enjoin and remedy the ongoing harm.

20.    NorthPoint and East Gate seek a declaration that the 40-year limitation on the City of Joliet's ability to modify weight restrictions on local roads, as set forth in Section XII.B(3) of the MOU, violates the federal antitrust laws, as well as an injunction barring enforcement of Section XII.B(3) against the City of Joliet. NorthPoint and East Gate also seek an order preliminarily and permanently enjoining CenterPoint's and HRE's unlawful actions and (1) damages for CenterPoint's and HRE's anticompetitive actions and agreements that violate state and federal antitrust laws; (2) disgorgement of profits CenterPoint unjustly received; and (3) damages from HRE for aiding and abetting the unlawful actions of CenterPoint.

## PARTIES

21.    Plaintiff East Gate is a Delaware Limited Liability Company, is licensed and registered to do business in Illinois. East Gate is the developer of a project in the Joliet Intermodal Zone commonly referred to as "Third Coast Intermodal Hub."

22.     Plaintiff NorthPoint is a Missouri Limited Liability Company that is registered to do business in Illinois, and NorthPoint is the manager of East Gate.

23.     Defendant CPT is a Maryland real estate investment trust. CPT is the manager of CJTR.

24.     Defendant CJTR is an Illinois Limited Liability company with its principal place of business in Oak Brook, Illinois and is licensed to do business in Illinois. CJTR is in the business of developing and managing industrial real estate and multimodal transportation infrastructure.

25.     Together, Defendants CPT and CJTR are referred to herein as "CenterPoint."

26.     Defendant HRE is an Illinois limited liability company. HRE is a joint venture between CenterPoint and United Bridge Partners. CenterPoint has a major financial investment in HRE and exerts control over HRE's operations—for example, CenterPoint executives sign agreements and attend meetings on behalf of HRE. As such, HRE is under CenterPoint's control or otherwise willfully acts in concert with CenterPoint pursuant to an agreement to achieve CenterPoint's anticompetitive goals. HRE is also the assignee of all CenterPoint's duties, obligations, rights, title and interest in the MOU. HRE is engaged in financing, constructing, engineering and operating improvements and roadways between U.S. Route 6 and Schweitzer Road, principally the Houbolt Road Toll Bridge.

## JURISDICTION AND VENUE

27.     This Complaint is filed and this action is instituted under Sections 4 and

16 of the Clayton Act (15 U.S.C. §§ 15, 26) to enjoin and declare invalid Section XII.B(3) of the MOU and to recover the damages caused by past and continuing violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. § 2), the Illinois Antitrust Act (740 ILCS 10/3), unjust enrichment, and aiding and abetting.

28.     This Court has original and exclusive jurisdiction over the subject matter of this civil action under 28 U.S.C. §§ 1331 and 1337. This Court may exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

29.     Venue in this District is proper under 28 U.S.C. § 1391 and to 15 U.S.C. §§ 15, 22, and 26 because a substantial part of the events or omissions giving rise to the claim occurred in material part within this District and the Defendants maintained a significant place of business in this District. The Joliet Intermodal Zone and the CenterPoint warehouse facilities at issue in this lawsuit are located in this District.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**I.     CenterPoint's monopoly over the commercial real estate development market in the Joliet Intermodal Zone.**

30.     The Joliet Intermodal Zone contains two of the largest intermodal facilities in the nation, including the nation's largest in-land port. It is situated 40 miles southwest of Chicago, south of the Des Plaines River, near I-80 and I-55, and southwest of Joliet, Illinois.

55925278.1



**The location of the LPC and JIT intermodals in the Joliet Intermodal Zone**

31.     CenterPoint began acquiring land in the Joliet Intermodal Zone in 2000 when it acquired 2,500 acres near Joliet, Illinois and Elwood, Illinois. CenterPoint's first major development of warehouse space in this area was a facility called CenterPoint Intermodal Center–Elwood, which included the BNSF Logistics Park Chicago ("LPC"). The BNSF LPC and the first CenterPoint warehouse opened in October 2002. The Intermodal Center–Elwood, includes the LPC and many large warehouses serving a variety of companies, including Walmart, Samsung, Clearwater Paper, CJ Logistics, RMC, and others.



**CenterPoint Intermodal Center–Elwood**

32. In 2010, CenterPoint completed a second project two miles north of CenterPoint Intermodal Center–Elwood: The CenterPoint Intermodal Center – Joliet. As pictured below, the CenterPoint Intermodal Center – Joliet surrounds Union Pacific's Joliet Intermodal Terminal ("JIT") and more than a dozen large warehouses that serve a variety of companies, including Walmart, Home Depot, Mars, Canadian Northern, and others.



**CenterPoint Intermodal Center – Joliet**

13

33.    Together, the two CenterPoint facilities—CenterPoint Intermodal Center – Joliet and the CenterPoint Intermodal Center – Elwood—comprise the contiguous CenterPoint Intermodal Center – Joliet/Elwood.

34.    CenterPoint is the master developer of the CenterPoint Intermodal Center – Joliet/Elwood, and it leases parcels/warehouses to tenants on which they can operate and manage freight and logistics activities.

35.    Businesses that ship products through the Joliet Intermodal Zone place a premium on proximity to the LPC and JIT, because close proximity of warehouses and distribution facilities to those intermodal facilities significantly reduces the cost associated with moving shipping containers from rail and into warehouses. In the shipping industry, the term "drayage" is used to describe these costs. As recognized by the Urban Land Institute report on the CenterPoint facility in Elmwood, "the advantage of locating distribution warehouses near an intermodal center is a reduced drayage cost."[6]

36.    The importance of drayage costs to warehouse users in the Joliet Intermodal Zone is highlighted by the fact that CenterPoint has an entire portion of its website devoted to the topic of "Drayage Savings" and tells customers that they will enjoy "50% Drayage Savings" in connection with using the warehouse facilities at CenterPoint Intermodal Center – Joliet/Elwood over using other warehouse facilities in the area, nearly all of which other than East Gate are farther away and

---

[6] Urban Land Institute, Development Case Studies, CenterPoint Intermodal Center-Elmwood, at 3, available at https://casestudies.uli.org/wp-content/uploads/2015/12/C038015.pdf.

less accessible via heavy truck.[7]

37.     As shown below, CenterPoint controlled virtually all of the land in the Joliet Intermodal Zone that could be used for large commercial and industrial developments, including warehouse and distribution facilities. Indeed, CenterPoint touts that its facilities "surround" the LPC and JIT.



38.     The primary and immediate threat to CenterPoint's stranglehold on the Joliet Intermodal Zone is the land southeast of the JIT and bounded by Millsdale Road, Route 53, Manhattan Road, and the Union Pacific railroad tracks. This is

where East Gate recognized an opportunity to build warehouse facilities that could accommodate trucks carrying shipping containers and other freight in competition with CenterPoint. East Gate has already built millions of square feet of warehouse space on that parcel. East Gate acquired additional land east of that parcel, which will be connected via a Closed Loop Truck Network, and it will also be used to compete with CenterPoint in the Joliet Intermodal Zone's warehouse market.

## II. East Gate attempts to compete with CenterPoint in the Joliet Intermodal Zone.

39. In 2013, East Gate began taking steps to develop the property southeast of the JIT, in the Joliet Intermodal Zone for commercial uses that would compete with CenterPoint's warehouse developments. East Gate envisioned a multi-phased project that would add more than 20 million square feet of industrial/warehouse space in the Joliet Intermodal Zone in its initial phase, with the potential to expand to approximately 40 million square feet.

40. In September 2013, East Gate began the process of acquiring land in the Joliet Intermodal Zone. In the following years, East Gate has continued to acquire additional property and entitlement for its properties, and today holds in excess of 3,000 acres of land for potential warehouse development with City-approved entitlements to construct approximately 20 million square feet of warehouses at present.

41. In January 2016, East Gate communicated with CenterPoint's land broker regarding the overall masterplan for the CenterPoint Intermodal Center – Joliet/Elwood, and East Gate attempted to acquire land directly from CenterPoint.

16

Additional contacts between East Gate agents and CenterPoint agents occurred in early 2016 related to East Gate's proposal to build more than 20 million square feet of industrial/warehouse space adjacent to the LPC and JIT facilities and within the Joliet Intermodal Zone. East Gate's project would compete with CenterPoint's potential and existing warehouse and distribution assets.

42.     The East Gate development – the Third Coast Intermodal Hub – would be connected to the Joliet Intermodal Zone via a portion of Millsdale Road (pictured below and circled in green) that was not approved for tractor-trailer traffic before the City of Joliet approved that temporary Millsdale Road access in 2021:



43.     East Gate's customers needed the ability to enter the Third Coast Intermodal Hub via this temporary connection to Millsdale Road, and that connection would provide the sole means of access for tractor trailers entering East Gate's

proposed development, pending future infrastructure improvements (described below).

44.     Aside from the temporary connection, the Third Coast Intermodal Hub would rely on a "Closed Loop Truck Network" in lieu of existing roads, which would direct traffic towards the Houbolt Road Toll Bridge. As part of the Third Coast Intermodal Hub development, East Gate also agreed to a number of other traffic improvements, including the implementation of a significant number of truck barriers that would prevent trucks from exiting the Joliet Intermodal Zone except through existing truck routes and other area-wide traffic improvements necessitated by the estimated traffic impacts of the project. The intent of all of these improvements was to decrease and efficiently manage truck traffic on local roads and further ensure that a significant portion of traffic from East Gate's project would be routed towards the Houbolt Road Toll Bridge.

45.     In connection with this development, East Gate conducted a traffic study that forecasted the Third Coast Intermodal Hub would generate 14,790 daily site-generated trips in 2032 and 35,320 daily site-generated trips in 2040. Of these site-generated trips, 2,320 trips would be trucks in 2032 and 5,550 would be trucks in 2040.

46.     Of those truck trips, 40% were expected to use the Houbolt Road Toll Bridge (or 2,220 daily trips in 2040). Assuming that toll rates do not increase over the next sixteen years, those trips would generate almost $13 million annually.

47.     The City of Joliet recognized that the Third Coast Intermodal Hub would

increase toll revenue earned by HRE and would require additional trucks to use the Houbolt Road Toll Bridge, increasing its financial viability, while decreasing truck traffic on the local road network.

48.     The Third Coast Intermodal Hub would directly compete with CenterPoint for warehouse and industrial tenants who use the LPC or JIT, since the Third Coast Intermodal Hub was designed to accommodate trucks carrying heavy shipping containers and offers comparable drayage savings as users of the CenterPoint Intermodal Center – Joliet/Elwood.

49.     Finally, by adding another commercial real estate developer to the Joliet Intermodal Zone, CenterPoint would be unable to continue charging supra-competitive prices in the relevant market as a monopolist.

### III.    In response to East Gate's attempt to enter the market, CenterPoint took actions to protect its monopoly.

50.     After East Gate began developing the Third Coast Intermodal Hub, CPT entered into the MOU dated December 19, 2016.

51.     The MOU was intended to help facilitate CenterPoint's construction of the Houbolt Road Toll Bridge, which it did by giving CenterPoint the authority to charge tolls on the bridge (again, as noted above, the MOU was later assigned by CenterPoint to HRE). However, another provision purported to restrict the City of Joliet's ability to regulate traffic on local roads.

52.     Specifically, the MOU provides, in relevant part:

The CITY and COUNTY agree that they will take no steps or actions to (1) eliminate CNT's authority to impose tolls and place restrictions on North CenterPoint Way; (2) build new roads adjacent to the CNT

Intermodal Center on which trucks may travel or build new roads that enter or exit the CNT Intermodal Center on which trucks may travel; and (3) *eliminate trucking restrictions, weight limits, or other similar regulations on roads that enter or exit the CNT Intermodal Center or on roads that are adjacent to the CNT Intermodal Center*.

MOU, Section XII.B (emphasis added).

53.     The MOU defines "adjacent to the CNT Intermodal Center" as all territory within the area described as the "Study Area" in the MOU.[8] While East Gate is not a party to the MOU and was provided no notice or opportunity to participate in the MOU negotiations, much of East Gate's Third Coast Intermodal Hub was included within the MOU's Study Area (including its already constructed warehouses and the location where it needs to connect the Closed Loop Truck Network to existing roadways to access the LPC and JIT).

54.     The effect of this provision was to prohibit the development of truck-accessible warehouse space on the undeveloped land closest to the Joliet Intermodal Zone.

55.     Following the execution of the MOU, CPT assigned its duties, rights, title, and interest in the MOU to HRE.

56.     On July 23, 2020, HRE entered into a Bridge and Ground Lease Agreement with the City of Joliet ("Bridge Lease") that would go into effect upon the completion of the Houbolt Road Toll Bridge.

57.     HRE, together with CenterPoint and their partners began constructing

---

[8] The map depicting the "Study Area" appears in Exhibit A to the MOU. The "Study Area" is approximately bounded by I-80 to the North, I-55 to the West, Route 53 to the East, and Arsenal Road to the South, with narrow strips extended south of Arsenal Road in corridors along I-55 and Route 53.

55925278.1

the Houbolt Road Toll Bridge in March 2021 and completed the project in April 2023. Upon completion, the Bridge Lease went into effect. The Houbolt Road Toll Bridge became the most direct path between I-80 and the Joliet Intermodal Zone.

**IV. The anticompetitive provision of the MOU was not enacted pursuant to Illinois policy to displace competition, nor was it supervised by any entity within the Illinois government.**

58. Section XII.B(3) of the MOU is not outside the reach of the federal antitrust laws. At no point did the Illinois legislature consent to giving CenterPoint a monopoly or near-monopoly over the provision of warehouse space in and around the largest inland port in the United States. Nor did the Illinois legislature give its Department of Transportation, the County of Will, or the City of Joliet authority to create a monopoly for warehouse and distribution facilities. Indeed, the City of Joliet now wants to allow competition from East Gate, demonstrating that the state entities involved did not foresee that the MOU might be used to eliminate competition in the warehousing of goods traveling in interstate commerce. Finally, no state agency or branch has supervised the enforcement of the MOU as it pertains to the displacement of competition in and around the Joliet Intermodal Zone. To the contrary, the City of Joliet has exercised its legislative authority and police powers to prevent Section XII.B(3) of the MOU from being used by CenterPoint and HRE to restrict its inherent authority, power, and jurisdiction to modify the weight limits on City roads.

**V. HRE files a pretextual lawsuit in support of CenterPoint's improper aims to prevent the Third Coast Intermodal Hub from accessing the LPC and JIT to maintain CenterPoint's market power.**

59. In December 2021, the City of Joliet granted East Gate temporary access

21

on Millsdale Road to provide the Third Coast Intermodal Hub a tractor-trailer accessible route to the LPC and JIT. This access was vital to enable warehouse users in the Joliet Intermodal Zone to move heavy shipping containers between the railyards and East Gate's warehouses.

60.     This temporary connection would be removed upon completion of a permanent overpass bridge linking the Third Coast Intermodal Hub with existing portions of Millsdale Road that are already permitted for truck traffic. The purpose of the temporary connection was to allow the Third Coast Intermodal Hub project to move forward during the pendency of the permitting and construction process of that overpass.

61.      On May 9, 2022, HRE filed suit against the City of Joliet for, *inter alia*, breaching the MOU.

62.     In its complaint, HRE alleged that CenterPoint and HRE's investment to build the Houbolt Road Toll Bridge was predicated on limited truck access to the Joliet Intermodal Zone, and the City of Joliet's action threatened HRE's ability to collect tolls by granting East Gate temporary truck access to Millsdale Road.

63.     HRE's lawsuit inexplicably appears intended to ***discourage*** truck traffic and development into the Joliet Intermodal Zone. However, if HRE is controlled by CenterPoint or is acting in collusion with CenterPoint, HRE's rationale for pursuing its lawsuit makes sense.

64.     During the litigation that remains ongoing, the City of Joliet rejected HRE's interpretation of the MOU, and in the City of Joliet's Response to Plaintiff's

Verified Emergency Motion for Temporary Restraining Order, it argued:

> "[The Bridge Lease] **expressly, and notwithstanding any MOU provision to the contrary, preserves the City's ability to exercise its police powers**, which includes the power to adjust weight limits consistent with the Illinois Vehicle Code and regulates the use of city roadways. . . . Thus, HRE is wrong that the MOU gives it a right to dictate how the City may exercise its police powers, as HRE contractually agreed otherwise in the Lease, which expressly controls over the MOU." (Emphasis in original)

65.     HRE's lawsuit is intended to thwart East Gate's Third Coast Intermodal Hub and East Gate's entry into the Joliet Intermodal Zone. HRE's lawsuit is not about lost tolls.

66.     Indeed, HRE's lawsuit is plainly pretextual because CenterPoint and others regularly use Millsdale Road for truck access to CenterPoint's facilities and HRE took no action to enjoin CenterPoint's violations or other violations of the weight restrictions and truck restrictions on Millsdale Road. For example, the City of Joliet has previously counted significant violations of the Millsdale Road weight restriction exiting the CenterPoint Intermodal Center – Joliet/Elwood (on February 22 and 23, 2024, specifically). Since East Gate's project is not operational as of today, none of these trucks come from the East Gate project.

67.     Despite flagrant violations of these weight restrictions, HRE only sought to enforce the MOU restrictions against East Gate and its Third Coast Intermodal Hub, and not against CenterPoint, the CenterPoint Intermodal Center – Joliet/Elwood, or any other entities.

68.     Nevertheless, on or about February 12, 2024, HRE's attorneys represented to the Will County Court in its Memorandum of Law in Support of its

Emergency Motion for Temporary Restraining Order that the City of Joliet's actions "would have an extreme and incalculable negative impact on HRE's ability to collect toll revenue[.]" The truth, however, is that East Gate's development would ***increase*** use of the Houbolt Road Toll Bridge, which is an obvious consequence of the tens of millions of square feet of warehouses to be constructed by East Gate that would necessarily be served by significant amounts of trucks. HRE's misstatements went to the very core of HRE's case, because HRE was seeking a Temporary Restraining Order based on claims that East Gate's development would decrease use of the Houbolt Road Toll Bridge.

69.     Using these arguments, on March 19, 2024, HRE obtained a Temporary Restraining Order preventing the City of Joliet from connecting the Third Coast Intermodal Hub with the Joliet Intermodal Zone via a tractor-trailer accessible route.

70.      In other words, HRE secured an order based on bad-faith, fraudulent statements about the impact of East Gate's project on the Houbolt Road Toll Bridge.

71.     HRE's collusion with CenterPoint is obvious. In addition to filing a lawsuit against CenterPoint's competitor that has the effect of reducing tolls and harming HRE, HRE is selectively enforcing the MOU and road restrictions against East Gate while ignoring such violations by CenterPoint and its customers. Moreover, CenterPoint executives—Edward Harrington and Michael Tortorici—executed HRE's Bridge and Ground Lease Agreement. Either HRE is operating under an agreement to carry out CenterPoint's unlawful aims, or HRE is controlled by CenterPoint through CenterPoint's financial investment in HRE and its ability to

dictate HRE's actions. Either way, HRE is complicit in all activities carried out by CenterPoint to block competition from East Gate and monopolize the market for warehouse space in the Joliet Intermodal Zone.

**VI.    CenterPoint makes false statements regarding East Gate's Third Coast Intermodal Hub to discourage interest from tenants and maintain its market power.**

72.    CenterPoint also engaged in a widespread misinformation campaign concerning the Third Coast Intermodal Hub to discourage potential tenants from negotiating with East Gate.

73.    For example, months before the Will County Court entered the TRO, consumers of warehouse and distribution facilities in the Joliet Intermodal Zone were parroting CenterPoint's misinformation that the Third Coast Intermodal Hub lacked tractor-trailer access via Millsdale Road to the CLP and JIT. This misinformation campaign threatened to cost East Gate potential leases.

**VII.    Relevant Product and Geographic Market**

74.    The relevant product market at issue in this case consists of commercial warehouse and distribution space accessible by tractor trailers and used for the purpose of storing, repackaging, breaking up, and/or combining freight before the products are sent on to the final destination. Customers that require such warehouse and distribution space include big box stores, commodity traders, and third-party logistics providers. For these customers, storage facilities other than large warehouses are inadequate substitutes because they lack the capacity to meet the needs of the above-mentioned users. And facilities that are inaccessible by tractor

trailers are not reasonable substitutes, because many customers need the ability to transport heavy shipping containers directly to their warehouses to be loaded and unloaded.

75. The relevant geographic market in this case consists of the Joliet Intermodal Zone. As described in greater detail below, warehouses and distribution facilities outside the Joliet Intermodal Zone are not adequate substitutes because of the increased drayage and logistical costs associated with moving freight to these more distant and less accessible facilities.

76. The Joliet Intermodal Zone is situated at the heart of the United States' largest in-land port, the BNSF's LPC, and the Union Pacific's JIT. Located less than five miles apart, these two facilities represent the eastern terminus for goods arriving by rail from all major West Coast ports, and it is "the epicenter of the region's immense transportation infrastructure." In total, the freight that passes through the Joliet Intermodal Zone accounts for 3-4% of U.S. GDP.

77. Containers unloaded at ports, like the LPC and JIT, are transported, or "drayed," by trucks to and from warehouses, distribution centers, rail yards, and other locations outside of the ports at the expense of the cargo's owners. Although drayage is a very small component of the supply chain in terms of time and distance, its cost and potential problems can be disproportionately high. This is particularly true where containers are transporting goods that exceed road weight limits, a frequent drayage problem that often requires special permits and additional logistical complexity.

55925278.1

78.    Warehouses within the Joliet Intermodal Zone provide a solution to these problems because they reduce drayage costs (both in terms of expense, time, distance, and the number of trucks needed to dray shipments because trucks can make multiple additional trips). For example, a warehouse located within ten miles of the LPC and JIT can facilitate twice as many drayage trips per day as a warehouse located twenty miles away. Businesses that use warehouses within the Joliet Intermodal Zone also avoid the need to obtain special permits for loads that exceed road weight limits, reducing logistical complexity.

79.    Because of their close proximity to the intermodal, warehouses within the Joliet Intermodal Zone offer unparalleled drayage and logistics benefits that are essential to many categories of customer. For example, big box stores, commodity traders, and third-party logistics providers require warehouse space in very close proximity to the intermodal, and are willing to pay a premium for such warehouse space. Globalized trade and e-commerce increased the demand for these warehouses.

80.    In fact, CenterPoint advertises the fact that one such big box store, Walmart, "has saved $100 on every container move since opening distribution facilities within the CenterPoint Intermodal Center in Elwood, IL, a strategy that has yielded millions in drayage savings over the years."[9] CenterPoint further advertises that "[d]ue to the close proximity of the BNSF and UP terminals, a 500,000 square foot distribution facility at the [CenterPoint] Intermodal Center

---

[9]    CenterPoint Website, "Intermodal Advantages," https://centerpoint.com/media/intermodal-advantages/.

[Joliet/Elwood] could realize $400,000 in annual drayage savings."[10]

81.    Given these factors, the demand for warehouses in the Joliet Intermodal Zone has exploded. However, following the construction of dozens of warehouses, the land available to construct additional warehouses has dwindled, and CenterPoint holds only a handful of parcels capable of supporting warehouses. By contrast, East Gate holds thousands of acres and is poised to construct up to thirty additional warehouses within the Joliet Intermodal Zone.



82.    The land identified as "unavailable" in the map above is not suitable for the development of warehouses for a variety of reasons. These reasons include the

---

[10] *Id.*

55925278.1

presence of large chemical plants, a landfill, federally protected lands, a cemetery, existing commercial warehouses, residential housing, and a racetrack. Much of the land across the river is already occupied and the land to the east of the Joliet Intermodal Zone faces the MOU-imposed trucking restrictions.

83.     Given its Closed Loop Truck Network, East Gate's warehouses would offer the same drayage and logistical benefits as CenterPoint's existing warehouses, which dominate the market for warehouses in the Joliet Intermodal Zone.

84.     Warehouse space outside of the Joliet Intermodal Zone, however, does not offer the same benefits. Drayage cost other logistical costs are substantially higher when moving freight to warehouses outside of the Joliet Intermodal Zone. Indeed, CenterPoint specifically markets its space as offering "50% Drayage Savings" over space located outside the Joliet Intermodal Zone. Warehouses further from the Joliet Intermodal Zone (e.g., 20 miles or further), west of the Des Plaines River, or south of the Kankakee River are not adequate substitutes given the increased drayage costs and other logistical costs associated with transporting goods from the LPC and JIT to these locations. This is especially important for big box stores, commodity traders, and third-party logistics providers that require warehouse space in very close proximity to the intermodal, and are willing to pay a premium for such warehouse space.

85.     Currently, CenterPoint controls approximately 80% of that market for warehouse space within the Joliet Intermodal Zone. It has used its market power to obtain rental rates that are approximately 20% higher than rates for warehouses

outside of the Joliet Intermodal Zone. CenterPoint's rents also increase annually at approximately 10% higher rates than rents outside of the Joliet Intermodal Zone. These significant price differences indicate that customers are willing to pay a premium for warehouse space located in very close proximity to the intermodal, which they do not view as reasonably interchangeable with warehouse space located further away.

86.     Pursuant to the anti-competitive road use restriction contained in the 40-year MOU, via the unlawful cooperation of HRE, which now holds the rights under both the MOU and the Bridge Lease, if such provision is allowed to be enforced as HRE has asserted, CenterPoint will have the ability to exclude competitors from entering the Joliet Intermodal Zone's commercial development market for decades by preventing their ability to construct warehouse and distribution facilities in the Joliet Intermodal Zone that are accessible to tractor trailers via an economical and safe trucking route.

87.     If successful, HRE and CenterPoint's actions will significantly increase travel distances for trucks traveling between the LPC and JIT and East Gate's warehouses. As shown in the map below, this will dramatically reduce the attractiveness of East Gate's warehouses to consumers of warehouse space in the Joliet Intermodal Zone given increased drayage costs.



## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**(Declaration that Portions of the MOU are illegal and unenforceable under Section 1 of the Sherman Act Against CenterPoint and HRE) (15 U.S.C. § 1)**

88.    Plaintiffs incorporates by reference the allegations of the preceding paragraphs of this Complaint, as though fully set forth herein.

89.    Section 1 of the Sherman Act prohibits agreements that unreasonably restrain trade.

90.    The MOU is an agreement between HRE (formerly prior to assignment, CenterPoint), the Illinois Department of Transportation, the County of Will, and the City of Joliet. Section XII.B(3) of the MOU violates Section 1 of the Sherman Act because it unreasonably restrains competition, solidifies CenterPoint's monopoly in the market for warehouse facilities in the Joliet Intermodal Zone, and prevents the

55925278.1

entry of a disruptive new entrant, East Gate, thereby harming competition, warehouse users, and the public at large.

91.     This section of the MOU that gives CenterPoint a 40-year monopoly over the Joliet Intermodal Zone offers no procompetitive benefits. To the contrary, enforcement of these provisions would *reduce* toll revenue to the Houbolt Road Toll Bridge and perpetuate CenterPoint's dominant market position in the market for warehouse facilities in the Joliet Intermodal Zone for years.

92.     For these reasons, the court should enjoin the provision in Section XII.B(3) of the MOU that prohibits the City from eliminating "trucking restrictions, weight limits, or other similar regulations" on roads that enter or exit CenterPoint Intermodal Center or are adjacent to such roads.

93.     The MOU is not immune from federal antitrust scrutiny. The legislature of the State of Illinois never expressed an intent to displace competition for warehouse services in the Joliet Intermodal Zone, nor did it authorize any of the other governmental MOU signatories to do so. In addition, no Illinois governmental entity has supervised the competition-eliminating provisions in the MOU. In fact, the City of Joliet has determined that the MOU does not restrict its inherent authority, power, and jurisdiction to regulate truck traffic on City roads and has attempted to exercise its police and other applicable powers to facilitate the movement of freight on trucks via a direct, economical, and safe route.

### SECOND CAUSE OF ACTION
### (Monopolization by Market Foreclosure in Violation of Section 2 of the Sherman Act against CenterPoint) (15 U.S.C. § 2)

94.     Plaintiff incorporates by reference the allegations of paragraphs 1-87 of

32

this Complaint, as though fully set forth herein.

95.     Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, the willful monopolization of any part of trade or commerce among the States and any conspiracy to achieve monopolization. Defendants' conduct and practices are anticompetitive, predatory, and/or exclusionary.

96.     East Gate and NorthPoint have the requisite standing to assert antitrust claims against Defendants because they are participants and competitors in the relevant market for commercial warehouses and distribution facilities in the Joliet Intermodal Zone, and they would continue constructing and developing warehouses and distribution facilities in the Joliet Intermodal Zone if not for CenterPoint's unlawful conduct.

97.     CenterPoint has a monopoly over the Joliet Intermodal Zone's market for warehouses and distribution facilities as it controls virtually all warehouse and distribution facilities in and around the CLP and JIT, and it is excluding the sole competitor capable of constructing warehouses and distribution facilities at scale with comparable drayage savings to those offered by CenterPoint.

98.     CenterPoint has undertaken its anticompetitive conduct with the purpose of monopolizing, with the deliberate and specific intent to monopolize warehouse and distribution facilities in the Joliet Intermodal Zone.

99.     Commercial businesses attempting to enter the warehouse and distribution facilities market and compete against CenterPoint in the Joliet Intermodal Zone face a competitive disadvantage because they are forced to either

construct warehouse and distribution facilities without tractor trailer access or are forced to construct warehouse and distribution facilities further from the CLP and JIT, significantly increasing drayage costs and logistics costs.

100. Consumers of warehouse and distribution facilities in the Joliet Intermodal Zone have been deprived of their choice of warehouse and distribution facilities on the basis of price, quality, reliability, and other criteria. Competition in the market for warehouse and distribution facilities would lower lease prices, which would in turn, lower the costs of goods traversing through the Joliet Intermodal Zone.

101. Significant and high barriers to market entry exist in the form of CenterPoint's effective veto over the construction of tractor-trailer accessible roadways, scarcity of land in the Joliet Intermodal Zone, high capital investments, and CenterPoint's monopoly. These barriers discourage new entry into the relevant market.

102. CenterPoint's monopoly position has been acquired and maintained through intentional exclusionary and predatory conduct, as opposed to business acumen, accident, or by virtue of offering a superior product or service, greater efficiency, or lower prices. The foregoing includes CenterPoint causing or convincing HRE to agree to pursue its bad faith lawsuit to uphold its anticompetitive position.

103. CenterPoint's anticompetitive acts have caused substantial economic injury to East Gate and NorthPoint and have also injured competition in the relevant markets by, *inter alia*, foreclosing, lessening and eliminating potential competition and depriving consumers from securing competitive prices for warehouse and

34

distribution facilities.

104. The aforesaid collective conduct of CenterPoint, HRE, and others has produced antitrust injury to East Gate and NorthPoint, competition, and consumers, and unless enjoined by the Court, will continue to produce at least the following anticompetitive, exclusionary and injurious effects upon competition in interstate commerce:

(a) Competition for warehouse and distribution facilities in the relevant market has been substantially and unreasonably restricted, lessened, foreclosed, and eliminated, and consumers have been forced to pay supra-competitive prices for warehouse and distribution facilities in the Joliet Intermodal Zone;

(b) CenterPoint's conduct has created and maintained significant and insurmountable barriers to entry, thereby ensuring continued unlawful maintenance of CenterPoint's monopolies;

(c) Prices for goods and other commodities traveling through the CLP and JIT have been artificially inflated because of CenterPoint's warehouse and distribution facilities monopoly in the Joliet Intermodal Zone; and

(d) Consumers have been deprived of any meaningful choices as to selection, price, convenience, location and quality of services for warehouse and distribution facilities in the Joliet Intermodal Zone.

105. By reason of, and as a direct and proximate result of CenterPoint's anticompetitive and exclusionary practices and conduct, East Gate and NorthPoint have suffered and will continue to suffer, financial injury to their businesses and

35

property. East Gate and NorthPoint have not yet calculated the precise extent of their past damages and cannot now estimate with precision the future damages that continue to accrue, but when East Gate and NorthPoint do so, they will seek leave of the Court to insert the amount of damages sustained herein.

106. Specifically, as a direct and proximate result of CenterPoint's continued and willful collective and combined monopolization and misuse of monopoly power, East Gate and NorthPoint are being and will continue to be irreparably injured by and through the following: (1) the loss of revenue and profits that would have otherwise been earned from services for warehouse and distribution facilities in the Joliet Intermodal Zone; (2) the loss of market share that would otherwise have been achieved by East Gate in a freely-competitive market; (3) diminution of the value of the property and warehouse facilities developed by East Gate; and (4) the loss of good will and value as a going concern, and East Gate and NorthPoint are entitled to treble damages, costs, and their reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
### (Attempted Monopolization by Market Foreclosure in Violation of Section 2 of the Sherman Act against CenterPoint) (15 U.S.C. § 2)

107. Plaintiffs incorporate by the allegations of paragraphs 1-87 of this Complaint, as though fully set forth herein.

108. CenterPoint has attempted to monopolize the market for warehouse and distribution facilities in the Joliet Intermodal Zone in violation of § 2 of the Sherman Act (15 U.S.C. § 2).

109. East Gate transacts business and sells warehouse and distribution facilities in the Joliet Intermodal Zone, which affects trade or commerce among the

36

States.

110.    CenterPoint possesses substantial market power in the relevant market as demonstrated by CenterPoint's high market share (approximately 80%), barriers to entry, and CenterPoint's exclusion of competition, and its ability to charge supra-competitive prices in the relevant markets.

111.    CenterPoint has implemented the anticompetitive scheme set forth above with the specific intent to monopolize the market for warehouse and distribution facilities in the Joliet Intermodal Zone. CenterPoint's scheme constitutes exclusionary conduct within the meaning of the Sherman Act including, without limitation, causing or convincing HRE to proceed with a sham lawsuit against HRE's own interests and in furtherance of CenterPoint's anticompetitive aims.

112.    There is a dangerous probability that CenterPoint will succeed in unlawfully extending its monopoly in the relevant markets through its anticompetitive scheme. Already, East Gate will be effectively foreclosed from competing for any substantial portion of sales for warehouse and distribution facilities in the Joliet Intermodal Zone if CenterPoint succeeds in blocking East Gate's access to tractor-trailer accessible roadways connecting the Third Coast Intermodal Hub to the CLP and JIT via a direct, economical, and safe route.

113.    CenterPoint's scheme has suppressed competition and has produced anticompetitive effects in the relevant market, including East Gate and NorthPoint's antitrust injury and damages, which is directly and proximately affecting trade or commerce among the States.

114. CenterPoint's conduct has no procompetitive benefit or justification. To the extent there is found to be any procompetitive benefit, the anticompetitive effects of CenterPoint's behavior outweigh any purported procompetitive justifications.

115. As a result of the harm to competition caused by CenterPoint's conduct, East Gate and NorthPoint have suffered substantial injuries to their businesses and property in an amount to be proven at trial and automatically trebled, as provided by § 2 of the Sherman Act (15 U.S.C. § 2), along with its costs and reasonable attorney's fees.

116. CenterPoint should be permanently enjoined from continuing its violations of § 2 of the Sherman Act (15 U.S.C. § 2). Without injunctive relief, East Gate and NorthPoint will continue to suffer irreparable injury as a result of CenterPoint's unlawful conduct. East Gate and NorthPoint's remedy at law is not by itself adequate to compensate East Gate and NorthPoint for the harm inflicted and threatened by CenterPoint.

## FOURTH CAUSE OF ACTION
### (Attempted Monopolization by Market Foreclosure in Violation of the Illinois Antitrust Act against CenterPoint) (740 ILCS 10/3)

117. Plaintiffs incorporate by reference the allegations of paragraphs 1-87 of this Complaint, as though fully set forth herein.

118. CenterPoint has attempted to monopolize the market for warehouse and distribution facilities in the Joliet Intermodal Zone in violation of the Illinois Antitrust Act (740 ILCS 10/3).

119. East Gate transacts business and offers services in connection with warehouse and distribution facilities in the Joliet Intermodal Zone, located within

38

the state of Illinois.

120.    CenterPoint possesses substantial market power in the relevant market as demonstrated by CenterPoint's high market share, barriers to entry, CenterPoint's exclusion of competition, and its ability to charge supra-competitive prices in the relevant markets.

121.    CenterPoint has implemented the anticompetitive scheme set forth above with the specific intent to monopolize the relevant markets. CenterPoint's scheme constitutes exclusionary conduct within the meaning of the Illinois Antitrust Act including, without limitation, causing or convincing HRE to undertake a bad faith lawsuit in furtherance of CenterPoint's anticompetitive objectives.

122.    Unless enforcement of the MOU is enjoined by this Court, CenterPoint will succeed in unlawfully extending its monopoly in the relevant markets through its anticompetitive scheme. East Gate will be effectively foreclosed from competing for any substantial portion of sales for warehouse and distribution facilities in the Joliet Intermodal Zone if CenterPoint succeeds in blocking East Gate's access to tractor-trailer accessible roadways connecting the Third Coast Intermodal Hub to the CLP and JIT via a direct, economical, and safe route.

123.    CenterPoint's conduct has no procompetitive benefit or justification. To the extent there is found to be any procompetitive benefit, the anticompetitive effects of CenterPoint's behavior outweigh any purported procompetitive justifications.

124.    As a result of the harm to competition caused by CenterPoint's conduct, East Gate and NorthPoint have suffered substantial injuries to their businesses and

property in an amount to be proven at trial and automatically trebled, as provided by the Illinois Antitrust Act (740 ILCS 10/7), and its costs and reasonable attorneys' fees.

125.    CenterPoint should be permanently enjoined from continuing its violations of the Illinois Antitrust Act. Without injunctive relief, East Gate and NorthPoint will continue to suffer irreparable injury as a result of CenterPoint's unlawful conduct. East Gate and NorthPoint's remedy at law is not by itself adequate to compensate East Gate and NorthPoint for the harm inflicted and threatened by CenterPoint.

**FIFTH CAUSE OF ACTION**
**(Unlawful Agreement in Violation of Section 1 of the Sherman Act against CenterPoint and HRE) (15 U.S.C. § 1)**

126.    Plaintiffs incorporate by reference the allegations of paragraphs 1-87 of this Complaint, as though fully set forth herein.

127.    Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits, *inter alia*, contracts, agreements or arrangements that unreasonably restrain competition to the detriment of consumers.

128.    CenterPoint and HRE have entered into an unlawful agreement in restraint of trade and commerce. Following the assignment of the MOU to HRE, HRE agreed that it would enforce the MOU for the benefit of CenterPoint to prohibit potential competitors from obtaining tractor-trailer access to warehouse and distribution facilities in the Joliet Intermodal Zone via a direct, economical, and safe route. According to CenterPoint and HRE, the MOU unlawfully grants HRE the unilateral power to restrict weight limits on local public roads, even for the City-approved temporary connection to Millsdale Road for the Third Coast Intermodal

40

Hub project. HRE has attempted to exercise this power under the unlawful provision of the MOU to foreclose competition and unreasonably restrain trade in violation of Section 1 of the Sherman Act.

129. The coordinated, collusive, and collective actions of CenterPoint and HRE have the purpose and effect of eliminating or substantially restricting competition in the market for warehouse and distribution facilities in the Joliet Intermodal Zone and raising the prices of warehouse and distribution facilities in the Joliet Intermodal Zone above competitive levels.

130. There is no legitimate business justification for HRE to enforce the MOU's restriction on the construction of tractor-trailer accessible roadways within the Joliet Intermodal Zone via a direct, economical, and safe route, particularly where, as here, that additional access point would further the business aim of HRE to recoup and generate a return on its investment in Houbolt Road Toll Bridge via toll revenue. The anticompetitive effects of this restraint outweigh any purported beneficial effects on competition.

131. HRE and CenterPoint's conduct has produced actual and antitrust injury to East Gate and NorthPoint, competition and consumers including a substantial foreclosure or elimination of competition in the relevant market, the creation and maintenance of significant barriers to entry, inflated prices for warehouse and distribution facilities in the Joliet Intermodal Zone, and injury to consumers who have been deprived of any choice between warehouse and distribution facilities in the Joliet Intermodal Zone and have been forced to pay supra-competitive

prices for warehouse and distribution facilities in the relevant market.

132.  By reason of, and as a direct and proximate result of, HRE's agreement to enforce the MOU on CenterPoint's behalf, East Gate and NorthPoint have been injured in their business and property, including but not limited to (1) the loss of revenue and profits that would have otherwise been earned from services for warehouse and distribution facilities in the Joliet Intermodal Zone; (2) the loss of market share that would otherwise have been achieved by East Gate in a freely-competitive market; and (3) the loss of good will and value as a going concern. Consumers have also been harmed by the unreasonable and substantial restriction of competition for warehouse and distribution facilities in the Joliet Intermodal Zone, eliminated consumer choice and price competition for such services, and consumers' reduced access to East Gate's competitive services. East Gate and NorthPoint have not yet calculated the precise extent of their past damages and cannot now estimate with precision the future damages that continue to accrue, but when East Gate and NorthPoint do so, they will seek leave of the Court to insert the amount of damages sustained herein.

133.  By acting under the control of CenterPoint, at the direction of CenterPoint, or in agreement with CenterPoint, HRE has carried out in tandem all actions of CenterPoint as described above in violation of the Sherman Act.

134.  As a result of CenterPoint and its co-conspirators' (including, specifically, HRE's) violation of 15 U.S.C. § 1, East Gate and NorthPoint are entitled to treble damages, costs, and reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION
### (Unlawful Agreement in Violation of 740 ILCS 10/3 against CenterPoint and HRE)

135.    Plaintiffs incorporate by reference the allegations of paragraphs 1-87 as though fully set forth herein.

136.    CenterPoint and HRE entered into an agreement to restrain trade in violation of the Illinois Antitrust Act (740 ILCS 10/3).

137.    This agreement includes an understanding and concerted action between and among CenterPoint and its co-conspirators in furtherance of a scheme whereby CenterPoint and its co-conspirators sought to exclude competition for warehouse and distribution facilities in the Joliet Intermodal Zone.

138.    CenterPoint and HRE's agreement impacted the market for warehouse and distribution facilities in the Joliet Intermodal Zone, which affected commerce in the state of Illinois, including East Gate's attempt to enter the market for warehouse and distribution facilities in the Joliet Intermodal Zone.

139.    The contract, combination, or conspiracy has had the following effects, among others: substantial restriction of competition for warehouse and distribution facilities in the Joliet Intermodal Zone, elimination of consumer choice and price competition for such services, and consumers' reduced access to East Gate's competitive services.

140.    As a proximate result of CenterPoint and its co-conspirators' unlawful conduct, East Gate and NorthPoint have suffered injury to their businesses or

43

property.

141.    As a result of CenterPoint and its co-conspirators' (including, specifically, HRE's) violation of 740 ILCS 10/3, East Gate and NorthPoint are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 740 ILCS 10/7.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment against CenterPoint)

142.    Plaintiffs incorporate by reference the allegations of paragraphs 1-87 as though fully set forth herein.

143.    In the alternative or in addition to the foregoing claims, East Gate and NorthPoint are entitled to recovery under Illinois state law for unjust enrichment.

144.    CenterPoint has unjustly retained benefits received, to the detriment of East Gate and NorthPoint. CenterPoint's unjust enrichment includes, but is not limited to, profits received by CenterPoint as a result of its wrongful actions which attempted and actually excluded East Gate from competing in the market for warehouse and distribution facilities in the Joliet Intermodal Zone.

145.    As a direct result of CenterPoint's unjust enrichment, East Gate and NorthPoint have suffered impoverishment and has been injured in its business or property.

146.    In the event East Gate and NorthPoint do not fully prevail on its other claims, no adequate remedy exists at law to allow East Gate and NorthPoint to seek restitution for their injuries.

147.    No justification exists for CenterPoint's receipt or retention of the unjust enrichment it has received as a result of its wrongful actions which directly injured

East Gate and NorthPoint. Therefore, East Gate and NorthPoint are entitled to disgorgement of all profits resulting from CenterPoint's receipt of inflated payments arising out of its actions to exclude competitors from participating in the market for warehouse and distribution facilities in the Joliet Intermodal Zone.

**EIGHTH CAUSE OF ACTION**
**(Aiding and Abetting against HRE under Illinois law)**

148.    Plaintiffs incorporate by reference the allegations of paragraphs 1-87 as though fully set forth herein.

149.    HRE accepted the assignment of the MOU, an unreasonable restraint of trade. HRE did so knowing that CenterPoint wanted it to pursue a lawsuit against the City of Joliet in order to maintain CenterPoint's monopoly over warehouse services in the Joliet Intermodal Zone. HRE continues to perpetuate the unreasonable restraints of trade contained in the MOU, including by pursuing a lawsuit, at the direction of CenterPoint or in agreement with CenterPoint, against HRE's own interest to further CenterPoint's anticompetitive and monopolistic objectives.

150.    HRE filed its lawsuit knowing it was pretextual and based on false statements. HRE then sought to enforce an agreement containing an unreasonable restraint of trade in order to exclude East Gate from competing in the market for warehouse services in the Joliet Intermodal Zone. HRE either did so at the direction of CenterPoint or under agreement with CenterPoint.

151.    In accepting the assignment and pursuing its lawsuit, HRE knowingly and substantially assisted CenterPoint in maintaining its monopoly power over the

market for warehouse services in the Joliet Intermodal Zone.

152. As a direct result of HRE's actions to aid and abet CenterPoint, East Gate and NorthPoint has suffered impoverishment and has been injured in their businesses or property.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs NorthPoint Development, LLC and East Gate-Logistics Park Chicago, LLC request the entry of judgment against Defendants as follows:

1. A declaration that Section XII.B(3) of the MOU violates state and federal antitrust laws, and is therefore void;

2. An order enjoining the enforcement of Section XII.B(3) of the MOU against the City of Joliet;

3. That the conduct of Defendants be adjudged to violate Section 2 of the Sherman Act;

4. That the conduct of Defendants be adjudged to violate Section 1 of the Sherman Act;

5. That the conduct of Defendants be adjudged to violate the Illinois Antitrust Act;

6. That Plaintiffs recover treble the amount of their actual damages sustained from Defendants by reason of the foregoing violations of federal and state antitrust laws;

7. That Defendants be preliminarily and permanently enjoined from engaging in the wrongful conduct, and ordered to cease interference with the Third

Coast Intermodal Hub's ability to access the CLP and JIT via tractor-trailer accessible roadways so as to enable competition in the relevant market;

8. That Plaintiffs be awarded damages in an amount according to proof against Defendants for Defendants' unjust enrichment in violation of Illinois state law;

9. That Plaintiffs be awarded their reasonable attorneys' fees and costs of litigation; and

10. That this Court provide such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury of all issues so triable.

Dated: May 8, 2024

Respectfully submitted,

/s/ Robert J. Palmersheim
Robert J. Palmersheim
Timothy G. Parilla
Honigman LLP
155 N. Wacker Dr., Ste. 3100
Chicago, IL 60606
(312) 701-9300
rpalmersheim@honigman.com
tparilla@honigman.com

Herbert F. Allen (pro hac vice forthcoming)
Honigman LLP
1440 New York Ave. NW, Ste. 200
Washington, DC 20005
(202) 899-4133
hallen@honigman.com

*Attorneys for East Gate-Logistics Park Chicago, LLC and NorthPoint Development, LLC*

47