IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| East Gate-Logistics Park Chicago, LLC; and NorthPoint Development, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> CenterPoint Properties Trust; CenterPoint Joliet Terminal Railroad, LLC; and Houbolt Road Extension JV, LLC, <br><br> Defendants. | Case No. 24 C 3742 <br><br> Hon. LaShonda A. Hunt |

## MEMORANDUM OPINION AND ORDER

Plaintiffs East Gate-Logistics Park Chicago, LLC ("East Gate") and NorthPoint Development, LLC ("NorthPoint") bring this antitrust action against Defendants CenterPoint Properties Trust ("CPT"), CenterPoint Joliet Terminal Railroad, LLC ("CJTR"), together with CPT, "CenterPoint"), and Houbolt Road Extension JV, LLC ("HRE") based on the theory that Defendants have monopolized and blocked competitors from the commercial warehouse market near two large railroad terminals. Currently before the Court are Defendants' motions to dismiss for lack of jurisdiction and, in the alternative, to stay and/or to dismiss for failure to state a claim upon which relief can be granted. The Court previously stayed consideration of Plaintiffs' motions for preliminary injunction and expedited discovery pending a ruling on Defendants' motions. For the reasons discussed below, the Court denies Defendants' motion to dismiss for lack of jurisdiction (Dkt. 61) and grants their motion for a stay (Dkt. 48). Consequently, Plaintiffs' motions for a preliminary injunction (Dkt. 23) and expedited discovery (Dkt. 45) and Defendants' motion to dismiss for failure to state a claim (Dkt. 50) are denied without prejudice.

1

## BACKGROUND

### I. Joliet Intermodal Zone

Located approximately 40 miles south of Chicago, Elwood and Joliet, Illinois, are home to the BNSF Logistics Park Chicago and the Union Pacific Intermodal Terminal, two of the largest intermodal terminals in the United States (together with the surrounding area, the "Joliet Intermodal Zone"). (Compl. ¶¶ 2, 30, Dkt. 1). Each year, the freight that passes through the Joliet Intermodal Zone accounts for approximately 3-4% of gross domestic product. (*Id.* ¶ 2). An "intermodal terminal" is a facility where freight is transferred from one mode of transportation to another. (*Id.* ¶ 1). In this instance, freight arrives to the Joliet Intermodal Zone by rail and is transferred to trucks. (*Id.* ¶ 2). During transfer, freight must often be stored, repackaged, broken up, and/or combined with other goods in warehouses and distribution facilities. (*Id.* ¶ 1). Close proximity to the BNSF and Union Pacific terminals significantly reduces the cost of transfer such that nearby warehouse and distribution facilities can charge a premium for rent. (*Id.* ¶ 35).

### II. Parties

In the early 2000's, CenterPoint began purchasing land in the Joliet Intermodal Zoneto develop warehouse and distribution space. (*Id.* ¶ 31). CenterPoint currently owns approximately 6,400 acres of land and 17 million square feet of warehouse space, comprising the CenterPoint Intermodal Center – Joliet/Elwood. (*Id.* ¶¶ 3, 33). More than 50 tenants currently rent from CenterPoint, including household names like Walmart, Samsung, Home Depot, and others. (*Id.* ¶¶ 31-32). Starting in 2013, NorthPoint (and later East Gate) began to plan a competing warehouse development in the Joliet Intermodal Zone. (*Id.* ¶ 5). To that end, East Gate has purchased 3,200 acres of land and is currently developing three warehouses comprising about 3.4 million square feet of space. (*Id.* ¶ 6).

2

### III. Memorandum of Understanding dated December 19, 2016

CenterPoint learned about East Gate's plans in early 2016. (*Id.* ¶ 7). According to East Gate, CenterPoint embarked on a plan to block East Gate's entry to the market through an agreement to build a toll bridge connecting the Joliet Intermodal Zone with the nearest interstate highway. (*Id.* ¶ 8). Under the agreement, a Memorandum of Understanding dated December 19, 2016 (the "MOU"), CenterPoint, the City of Joliet, the Will County Department of Transportation, and the Illinois Department of Transportation agreed that CenterPoint would finance the building of the toll bridge. (*Id.*; *see* Compl. Ex. A (MOU)). CenterPoint subsequently assigned all of its rights, obligations, interest and title in the MOU to HRE. (*Id.*) Central to this case, Section XII.B(3) of the MOU provides as follows:

> **The CITY and COUNTY agree that they will take no steps or actions to** (1) eliminate [CenterPoint's] authority to impose tolls and place restrictions on North CenterPoint Way; (2) build new roads adjacent to the [CenterPoint] Intermodal Center on which trucks may travel or build new roads that enter or exit the [CenterPoint] Intermodal Center on which trucks may travel; and **(3) eliminate trucking restrictions, weight limits, or other similar regulations on roads that enter or exit the [CenterPoint] Intermodal Center or on roads that are adjacent to the [CenterPoint] Intermodal Center.**

(MOU § XII.B(3) (emphasis added)). The term "adjacent to the [CenterPoint] Intermodal Center" is a defined geographic area (the "Study Area"), which is set forth in a map attached to the MOU. (*See* MOU § XII.D). The Study Area essentially covers the north half of the Joliet Intermodal Zone, including the Union Pacific terminal, the CenterPoint Intermodal Center – Joliet, and East Gate's development. (*See* MOU Ex. A (Study Area) at 18, Dkt. 1-1).[1]

---

[1] Unless otherwise noted, all page numbers in citations to documents filed on the docket are to page numbers on the CM/ECF headers of the filings, not page numbers at the bottom of the page.

## IV. East-Gate's Temporary Connection to Millsdale Road

As part of East Gate's development plans, it obtained approval from the City of Joliet for various zoning, subdivision, and land development changes. (Compl. ¶ 12). In 2021, the City of Joliet agreed to allow East Gate to construct a temporary connection to Millsdale Road and permit trucks to use a portion of the road on which truck traffic was previously prohibited due to weight restrictions. (*Id.* ¶ 12, 59). The temporary connection would allow East Gate's customers to travel directly between their warehouses and the Joliet Intermodal Zone until a permanent overpass bridge could be built. (*Id.* ¶ 63). Without the temporary connection, East Gate's customers would have no way to travel between East Gate's facilities and the Joliet Intermodal Zone due to existing weight restrictions on local roads.[2] (*Id.* ¶ 43).

## V. State Court Action

On May 9, 2022, HRE filed a lawsuit against the City of Joliet in the Circuit Court of Will County, Illinois, *Houbolt Road Extension JV, LLC v. City of Joliet*, No. 22 MR 138 (Will Cnty. Cir. Ct.) (the "State Court Action"), seeking to enforce the MOU through an injunction prohibiting the City from temporarily allowing trucks to use Milldale Road. (*Id.* ¶ 13).[3] HRE maintains that the purpose of the suit is to avoid potential lost toll bridge revenue caused by the grant of a temporary connection, while East Gate believes that HRE is attempting to block competitors from the market. (*Id.* ¶¶ 10, 14).

---

[2] At the August 30, 2024 hearing in this matter, East Gate's counsel reported that one tenant currently has limited permission to use an indirect route to access the Joliet Intermodal Zone from East Gate's facilities.

[3] The Verified Complaint in the State Court Action names HRE as Plaintiff, CenterPoint as "Interested Parties/Plaintiffs," the City of Joliet as Defendant, and East Gate and other parties as "Interested Parties." *Houbolt Road Extension JV, LLC v. City of Joliet*, No. 22 MR 138, Verified Complaint (Will Cnty. Cir. Ct. May 9, 2022).

Although the state trial court initially dismissed the State Court Action, the state appellate court reversed that ruling based on the conclusion that HRE had sufficiently pled a claim that the City of Joliet violated MOU § XII.B(3) by taking steps or actions to allow East Gate to use a temporary connection to allow trucks to access a portion of Millsdale Road. *Houbolt Rd. Extension JV, LLC v. City of Joliet*, 2023 IL App (3d) 220433-U, ¶¶ 46-52, *appeal denied*, 223 N.E.3d 633 (Ill. 2023) (the "State Court Appeal"). On remand, the state trial court held a hearing and issued a temporary restraining order dated March 19, 2024, enjoining the City of Joliet from permitting use of the temporary connection to Millsdale Road (the "State Court TRO"). (Compl. ¶ 16). The parties to the State Court Action are currently engaged in discovery, with a preliminary injunction hearing set for March 17, 2025, followed by six weeks of post-hearing briefing. *Houbolt Road Extension JV, LLC v. City of Joliet*, No. 22 MR 138, Order (Will Cnty. Cir. Ct. Aug. 5, 2024).

## VI. Procedural History

On May 8, 2024, less than two months after entry of the State Court TRO, Plaintiffs filed this action in Federal court seeking to invalidate MOU § XII.B(3) under antitrust law and to restore truck access to Millsdale Road via the temporary connection, among other things. (*See* Compl. at 46-47). In July, Plaintiffs moved for entry of a preliminary injunction and expedited discovery. (Dkts. 23 & 45, respectively). In response, Defendants filed motions to stay this case pending the outcome of the State Court Action and for dismissal based on failure to state a claim or lack of subject-matter jurisdiction. (Dkts. 48, 50, 61). Consideration of Plaintiffs' preliminary injunction and expedited discovery motions has been stayed pending resolution of Defendants' motions. (Dkt. 58). The stay and dismissal motions were fully briefed as of August 29, 2024, and the parties presented oral arguments on August 30, 2024. (Dkts. 87, 88). Following the hearing, the Court

took the matters under advisement. (Dkt. 88). Having considered the briefs, arguments, and relevant authority, the Court is ready to rule.

## DISCUSSION

Defendants' motions present three discrete issues. First, Defendants argue that the Complaint should be dismissed for lack of subject-matter jurisdiction under the *Rooker-Feldman* doctrine. Second, if the case is not dismissed for lack of jurisdiction, Defendants contend that it should be stayed pending resolution of the State Court Action under the *Colorado River* doctrine. Finally, if neither doctrine applies, Defendants challenge whether the Complaint states a claim upon which relief can be granted under Rule 12(b)(6). "Because the *Rooker-Feldman* doctrine operates as a 'jurisdictional bar,'" the Court must consider that motion first. *Gilbank v. Wood Cnty. Dep't of Hum. Servs.*, 111 F.4th 754, 764 (7th Cir. 2024) (quoting *Andrade v. City of Hammond*, 9 F.4th 947, 948 (7th Cir. 2021)).

### I. Subject-Matter Jurisdiction

When ruling on a motion to dismiss for lack of jurisdiction, the Court must "accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Sherwood v. Marchiori*, 76 F.4th 688, 693 (7th Cir. 2023) (quoting *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021)). In addition, the Court may consider "whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993) (quoting *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979)). Thus, the Court looks to the allegations of the Complaint, as well as the affidavits submitted by the parties, in evaluating whether jurisdiction exists.

Sitting *en banc*, the Seventh Circuit recently issued a comprehensive opinion addressing the "limited circumstances" in which the *Rooker-Feldman* doctrine applies and discussing the elements that must be considered by a district court making that determination. *See Gilbank*, 111 F.4th at 764-766. Essentially, the doctrine applies "only in 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Id.* (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 286 (2005)). In other words, *Rooker-Feldman* has limited application and "must neither interfere with [a Federal court's] 'virtually unflagging obligation' to exercise the jurisdiction that Congress has granted . . . nor swallow up issues that are properly resolved under abstention or claim-and issue-preclusion doctrines." *Gilbank*, 111 F.4th at 765-766 (quoting *Exxon Mobil*, 544 U.S. at 283, 291; *Huon v. Johnson & Bell, Ltd.*, 657 F.3d 641, 645 (7th Cir. 2011); *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Thus, "[i]f a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'" *Exxon Mobil*, 544 U.S. at 293 (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)).

With those guiding principles in mind, the *Rooker-Feldman* doctrine applies when five elements are satisfied: (1) "the federal plaintiff must have been a state-court loser[;]" (2) "the state-court judgment must have become final before the federal proceedings began[;]" (3) "the state-court judgment must have caused the alleged injury underlying the federal claim[;]" (4) "the claim must invite the federal district court to review and reject the state-court judgment[;]" and (5) the plaintiff must have had "a reasonable opportunity to raise her federal issues in the state courts."

7

*Id.* at 766. Although the State Court TRO likely effectuated the alleged injury underlying Plaintiffs' claims (third element), the Complaint effectively invites the Court to review and reject the State Court TRO (fourth element), and it is questionable whether Plaintiffs had a reasonable opportunity to raise their Federal antitrust issues in the State Court Action (fifth element), the Court is not satisfied Defendants have established that Plaintiffs lost in state court or that the State Court TRO became final before this Federal action began.

With respect to the first element, the Supreme Court has "held *Rooker-Feldman* inapplicable where the party against whom the doctrine is invoked was not a party to the underlying state-court proceeding." *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (citing *Johnson v. De Grandy*, 512 U.S. 997, 1006 (1994)). In addition, because the doctrine is circumscribed and "not simply preclusion by another name[,]" it "does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment." *Lance*, 546 U.S. at 466. Considering the facts of this case, Illinois procedure, and the overarching purpose of the *Rooker-Feldman* doctrine, the Court concludes that East Gate's limited involvement in the State Court Action does not make it a "party" for purposes of the *Rooker-Feldman* doctrine.

In the State Court Action, HRE designated East Gate as an "Interested Party" only and did not name NorthPoint at all. As a result, East Gate did not file an appearance, respond to the complaint, brief the initial dismissal, subsequent appeal, or TRO proceedings, or appeal the TRO.[4] Nor did East Gate file a petition to intervene or any other request aimed at inserting itself into the

---

[4] Although it appears that East Gate may have been permitted to be more active in the State Court Action (as Defendants here contend), the Court will not speculate as to the extent to which East Gate would have been allowed to participate.

8

case as a party. It appears that East Gate's only activity in the State Court Action has been filing a 3-page motion to strike objecting to the use of discovery obtained in other litigation, (Dkt. 51-5), the payment of some of the City of Joliet's legal bills (Dkt. 64 at 15), and appearance at two hearings in which they did not meaningfully participate, (Dkts. 72-1, 72-2). The scope of the State Court TRO is limited to the contractual relationship between HRE and the City of Joliet and no relief is entered against East Gate, although it appears undisputed that East Gate is in contractual privity[5] with the City of Joliet and its interests are affected by the TRO.

The Illinois Code of Civil Procedure includes a comprehensive set of rules governing parties to a civil action in Illinois state court. *See* 735 ILCS 5/2-401-5/2-417. The relevant provisions refer to the "party" commencing the action as the "plaintiff" and the "adverse party" as the "defendant" and set forth the procedures governing joinder of parties, third-party proceedings, and intervention, among other things. *See id.* The Code also contemplates the entry of declaratory judgments "at the instance of anyone interested in the controversy" and declaration of "the rights of the parties interested." *See* 735 ILCS 5/2-701(a). Although Defendants suggest that the references to interested parties in 735 ILCS 5/2-701(a) expand what a "party" is under Illinois law to include "interested parties" for purposes of *Rooker-Feldman*, the Court reads the provision to merely define who may bring a declaratory action and who a declaratory judgment may be entered against. Of course, that reading of the text affects who should or may be a plaintiff, defendant, or intervener in a declaratory action, but those determinations hinge on the facts of each particular case and are not assumptions to be made in all actions for declaratory relief. Thus, a person may be named as an "interested party" or have an interest in the controversy at the heart of a declaratory

---

[5] The Court expresses no opinion as to the effect of such privity for purposes of preclusion.

action, but not be a "party" to the case if they are not designated as such or if relief is not entered against them. That appears to be East Gate's role thus far in the State Court Action.

Here, East Gate's limited involvement in the State Court Action and absence as a party against whom any relief was entered by the TRO falls short of making it a party for purposes of the *Rooker-Feldman* doctrine. The bottom line is that the State Court Action is a dispute between two parties to a contract over the interpretation of a contract provision and the State Court TRO enters relief as between those parties. If East Gate were a named defendant or the State Court TRO entered relief against East Gate specifically, the result may be different, but being tangentially affected by virtue of being in contractual privity with the City of Joliet is not enough. Accordingly, the Court declines to expand the "limited circumstances" in which *Rooker-Feldman* applies to include cases in which a Federal plaintiff merely has an interest in the outcome of state court litigation but is not a party to the proceedings. Because East Gate is not a party to the State Court Action for purposes of *Rooker-Feldman*, it is not a "state-court loser," and the doctrine does not apply.

The analysis could stop there, but the "final judgment" requirement of the *Rooker-Feldman* doctrine provides an additional reason against its application. Two recent Seventh Circuit cases are instructive in this regard. In *Bauer v. Koester*, the plaintiffs "argue[d] that *Rooker-Feldman* applies only to *final* state-court judgments and thus does not apply to the state court's foreclosure judgment [against them], which was not a final appealable order under Illinois law." 951 F.3d 863, 867 (7th Cir. 2020) (emphasis in original). The court first noted the general rule that "the *Rooker-Feldman* doctrine 'does not apply independently to interlocutory orders[,]'" *id.* (quoting *Kowalski v. Boliker*, 893 F.3d 987, 995 (7th Cir. 2018)), but then acknowledged "interlocutory orders entered prior to the *final disposition* of state court lawsuits are not immune from the jurisdiction-stripping

10

powers of *Rooker-Feldman*[,]" *id.* (quoting *Sykes v. Cook Cnty. Cir. Ct. Prob. Div.*, 837 F.3d 736, 742 (7th Cir. 2016) (emphasis added)). Because the plaintiffs had paid the monetary judgment and a satisfaction of judgment had been filed in the foreclosure proceeding, the Seventh Circuit concluded that the case was "effectively final" and there was a "judgment" against them under *Rooker-Feldman*. *Bauer*, 951 F.3d at 867. More recently, in *Bryant v. Chupack*, at "the time [the] federal suit began, the state judiciary had ruled that the banks were entitled to foreclose on both parcels, but they had yet to be sold, and the court had not entered final judgments specifying who owe[d] how much to whom." 93 F.4th 1029, 1031 (7th Cir. 2024), *reh'g denied*, No. 22-3265, 2024 WL 1023769 (7th Cir. Mar. 8, 2024). Thus, when the plaintiffs commenced the Federal case, they "had lost a battle in state court but had not yet lost the war." *Id.* at 1032. But by the time the case reached the Seventh Circuit, "the state litigation [was] over by any standard." *Id.* at 1033. As a result, the law of preclusion, not the *Rooker-Feldman* doctrine, applied to the suit. *Id.*

The takeaway from these cases is that the touchstone of finality for purposes of *Rooker-Feldman* is not necessarily whether a particular order is appealable, as Defendants suggest, but rather, if the state court "case . . . is effectively final[,]" *Bauer*, 951 F.3d at 867, "final in any possible sense" or "over by any standard[,]" *Bryant*, 93 F.4th at 1032-33; *cf. Hadzi-Tanovic v. Johnson*, 62 F.4th 394, 400 (7th Cir. 2023) (child custody order was "final" under *Rooker-Feldman* despite the court's "continuing management" of child custody issues because state law provided that it superseded the prior judgment and was immediately appealable).

Having been commenced in May 2022, the State Court Action is already in its third year. But the case is nowhere near final or over, with the State Court TRO having just been entered in March 2024, the parties engaged in motion practice on the responsive pleadings, and ongoing discovery in preparation for a March 2025 preliminary injunction hearing. Although it would be a

11

stretch to say that Plaintiffs "lost the battle but not the war" when the State Court TRO was entered—since Plaintiffs are not a party to the State Court Action—the saying still accurately describes the posture of the State Court Action when this Federal suit was filed. To conclude that a case still so far from a final decision on the merits is "final" for purposes of *Rooker-Feldman* would ignore clear Seventh Circuit and Supreme Court precedent cautioning district courts against a wide-reaching application of the *Rooker-Feldman* doctrine. *See, e.g., Lance v. Dennis*, 546 U.S. 459, 464 (2006) ("Neither *Rooker* nor *Feldman* elaborated a rationale for a wide-reaching bar on the jurisdiction of lower federal courts, and our cases since *Feldman* have tended to emphasize the narrowness of the *Rooker-Feldman* rule.") (listing cases). Accordingly, despite the immediate appealability of the State Court TRO, the State Court Action itself is far from over, so it does not constitute a final judgment for purposes of *Rooker-Feldman*. Having determined that "the narrow ground occupied by *Rooker-Feldman*" does not warrant dismissal of this action for lack of subject-matter jurisdiction, *Exxon Mobil*, 544 U.S. at 284, the Court now turns to whether the case should be stayed pending resolution of the State Court Action.

## II. <u>Abstention</u>

In *GeLab Cosms. LLC v. Zhuhai Aobo Cosms. Co*, the Seventh Circuit recently canvased the *Colorado River* abstention doctrine and set forth the analysis district courts should apply in determining whether a stay is appropriate. 99 F.4th 424 (7th Cir. 2024). Essentially, "[o]nly if 'the presence of a concurrent state proceeding' makes abstention a matter of 'wise judicial administration' may a federal court refrain from doing the job the Constitution and Congress assigned to it." *Id.* at 428 (quoting *Colorado River*, 424 U.S. at 818); *see also Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1018 (7th Cir. 2014) ("The primary purpose of the *Colorado River* doctrine is to conserve both state and federal judicial resources and prevent inconsistent

results."). In determining whether to abstain, a district court should conduct "two inquiries, both of which put a thumb on the scale against abstention." *GeLab*, 99 F.4th at 428.

First, the court must consider "whether the state and federal court proceedings are actually parallel; if not, then the federal case must go forward." *Id.* "Cases are parallel if there is 'a substantial likelihood that the state litigation will dispose of all claims presented in the federal case.'" *Id.* (quoting *Freed*, 756 F.3d at 1018). "Two cases need not be identical to be parallel, but they must involve 'substantially the same parties [ ] contemporaneously litigating substantially the same issues.'" *GeLab*, 99 F.4th at 428 (quoting *Freed*, 756 F.3d at 1019).

If the proceedings are actually parallel, "the second question is whether exceptional circumstances warrant abstention." *GeLab*, 99 F.4th at 428 (citing *Huon*, 657 F.3d at 646-647). The Seventh Circuit has identified ten non-exhaustive factors relevant to deciding whether abstention is justified by exceptional circumstances. *GeLab*, 99 F.4th at 430. In considering those factors, a district court must engage in a "careful weighing of the factors pertinent to the case at hand[.]" *Id.* at 431 (quoting *Sverdrup Corp. v. Edwardsville Comm. Unit Sch. Dist. No. 7*, 125 F.3d 546, 550 (7th Cir. 1997)).

As discussed above, the named parties in the State Court Action and this case are not the same. But that difference can be logically explained by the narrower scope of the dispute in the State Court Action, which involves only a contract between HRE and the City of Joliet and the interpretation and enforceability of a specific provision. Likewise, the parties named in this suit makes sense given that the claims here are based on antitrust law. Despite these formal differences between the parties, the two cases "involve *substantially* the same parties" because "the parties 'have nearly identical interests.'" *GeLab*, 99 F.4th at 429 (emphasis in original) (quoting *Freed*, 756 F.3d at 1019). Indeed, the respective parties' identities and interests are substantially aligned

13

in both cases. CenterPoint was the original party to the MOU and assigned its interests to HRE, has a major financial interest in HRE, and exercises control over HRE's operations. CenterPoint and HRE stand to benefit from enforcement of MOU § XII.B(3) through the State Court Action and are exposed to various related business and legal risks by the antitrust claims in this case. NorthPoint was East Gate's predecessor in its Joliet Intermodal Zone development and remains East Gate's manager. Although NorthPoint and East Gate are not parties to the State Court Action, the viability of their development in the Joliet Intermodal Zone rises and falls with the outcome of both the State Court Action and this case because their customers' ability to access the terminals from their warehouses is essential to operations and overall viability of the development.

The State Court Action and this Federal case are also "predicated on the same facts," and "will be resolved largely by reference to the same evidence[.]" *GeLab*, 99 F.4th at 429 (quoting *Tyrer v. City of S. Beloit, Ill.*, 456 F.3d 744, 752 (7th Cir. 2006)). True, the State Court Action involves contract interpretation, and this case is based on antitrust law. But at bottom, both cases revolve around MOU § XII.B(3). If the City of Joliet ultimately prevails in the State Court Action, Plaintiffs' claims here will mostly become moot to the extent they depend on Defendants' interpretation and enforcement of the MOU. Even then, to the extent Plaintiffs seek to move forward with their claims based on damages caused by Defendants' prior conduct, a decision on the meaning of MOU § XII.B(3) is logically antecedent to any such determination. If HRE prevails, then the meaning of MOU § XII.B(3) will have been decided and the issues here will be greatly narrowed. Either way, the cases involve largely the same evidence, and to the extent additional evidence is relevant to the Federal claim, it will only become relevant if the state court first accepts HRE's interpretation of the MOU.

In sum, if the State Court Action ultimately resolves in the City of Joliet (and East Gate's) favor, "there is 'a substantial likelihood that the state litigation will dispose of all claims presented in the federal case.'" *GeLab*, 99 F.4th at 428 (quoting *Freed*, 756 F.3d at 1018). Although this case is couched in antitrust, state contract issues predominate. The primary reason Plaintiffs filed this action is to invalidate the MOU provision that impacts their pecuniary interests. Accordingly, the cases are parallel, and the Court must therefore proceed to the second inquiry of carefully weighing the factors relevant to whether there are exceptional circumstances that warrant abstention. Just as the Seventh Circuit did, the Court will address each factor and indicate which favor abstention, and which do not. *See GeLab*, 99 F.4th at 430.

1. **Whether the state has assumed jurisdiction over property—Disfavors Abstention.** It is undisputed that the state has not assumed jurisdiction over property. Therefore, this factor weighs against abstention.

2. **The inconvenience of the federal forum—Favors Abstention.** Relevant considerations for this factor include geographical proximity of the courts and location of the parties and evidence. *See Loughran v. Wells Fargo Bank, N.A.*, 2 F.4th 640, 650 (7th Cir. 2021) ("The convenience (or lack thereof) of the federal forum does not support abstention. The state and federal courts here are in close geographical proximity to one another and equally convenient."); *Veritas Admin., LLC v. Nowak*, No. 22 C 337, 2022 WL 17986697, at *4 (N.D. Ill. Dec. 29, 2022) (considering proximity of Joliet to Chicago and negligible difference between distance from party's location to courthouses and concluding that "[t]his factor weighs slightly in favor of abstention, if at all.").[6] The two courthouses are both within the Northern District of Illinois, most of the parties' attorneys are located in Chicago, the parties are citizens of various states and one is headquartered in Oak Brook, Illinois, and the subject property is located in Will County. This factor weights slightly in favor of abstention.

3. **The desirability of avoiding piecemeal litigation—Favors Abstention.** "The danger of piecemeal litigation does not turn on formal identity of issues but on concerns about the efficient use of judicial resources and the public's perception of the legitimacy of judicial authority[.]" *Tyrer*, 456 F.3d at 756. Although Plaintiffs' Federal claims

---

[6] The Court respectfully declines to follow the case law cited by Plaintiffs, as the reasoning is circular, without a citation to any authority, and arguably contained in dicta within the decision. (*See* Resp. to Mot. to Stay at 18-19, Dkt. 64) (citing *Pelfresne v. Stephens*, 35 F. Supp. 2d 1064, 1074 (N.D. Ill. 1999) ("the source of governing law in the present case is federal (RICO) (factor five), and therefore the federal forum is not inconvenient (factor two) . . . [.]").

15

encompass issues broader than those presented in the State Court Action, both cases ultimately turn on the meaning of MOU § XII.B(3). Thus, the possibility of issues being left unresolved by piecemeal litigation is not relevant here. Instead, the Court is concerned with potential of both (i) wasting two court's scarce resources by litigating the same issues in two cases at the same time and (ii) inconsistent results and the resultant effect on the public's perception of judicial legitimacy. Accordingly, this factor weights in favor of abstention.

4. **The order in which jurisdiction was obtained by the concurrent fora—Favors Abstention.** The State Court Action was filed more than two years before this Federal case. Although Plaintiffs contend that this factor disfavors abstention because its purpose is to discourage parties from getting as second chance to litigate issues already brought by them in state court, the focus of this factor is generally which case was filed first and the time in between filings. *See, e.g., Lumen Const., Inc. v. Brant Const. Co.*, 780 F.2d 691, 697 (7th Cir. 1985) ("Of course, the state case was also filed first, nearly five months before . . .[.]"); *Goldfein v. Brown*, No. 10 C 1955, 2010 WL 5146570, at *3 (N.D. Ill. Dec. 10, 2010) ("The federal case was filed nearly two years after the state cases."). Accordingly, this factor favors abstention.

5. **The source of governing law—Favors Abstention.** The State Court Action involves application of Illinois law of contracts, police power, and other matters. The Federal case involves Federal and state antitrust law and Illinois common law. Critically, however, even the Federal claims depend largely on interpretation of MOU § XII.B(3) under Illinois law because Plaintiffs' antitrust theory depends in part on whether Defendants' interpretation of that provision is correct. To the extent the issues governed exclusively by Federal law remain after the matters of Illinois law have been determined, the Court will be able to adjudicate them. Accordingly, this factor favors abstention.

6. **The adequacy of state-court action to protect the federal plaintiff's rights—Favors Abstention.** Through various arguments made in this litigation, Defendants have all but waived any objection to Plaintiffs' ability to meaningfully participate in the State Court Action. Plaintiffs' reference to other factors in support of this one is again circular and summarily rejected by the Court. This factor weighs in favor of abstention.

7. **The relative progress of state and federal proceedings—Favors Abstention.** The State Court Action has been pending for more than two years, already gone through one appeal, a TRO hearing was held and a TRO was issued, and the parties are engaged in discovery in preparation for a preliminary injunction hearing. This Federal case was filed a little over four months ago, has not yet emerged from the pleadings stage, and no substantive relief has been entered for or against any party. This factor weights in favor of abstention.

8. **The presence or absence of concurrent jurisdiction—Disfavors Abstention.** Although Defendants concede that Plaintiffs may file affirmative defenses based on Federal antitrust law and counterclaims based on Illinois antitrust law that offers similar

16

relief as the Sherman Act in the State Court Action, it is undisputed that the Federal court has exclusive jurisdiction over affirmative Sherman Act claims. Because concurrent jurisdiction over those claims does not exist, this factor weighs against abstention.

9. **The availability of removal—Favors Abstention.** "The unavailability of removal *favors* a stay, because the purpose of this factor is to prevent litigants from circumventing the removal statute." *Loughran*, 2 F.4th at 650. It is undisputed that the State Court Action is not removable. As such, this factor weighs in favor of abstention.

10. **The vexatious or contrived nature of the federal claim—Favors Abstention.** After more than two years of litigation in the State Court Action, Plaintiffs commenced the Federal case only when the State Court Appeal and State Court TRO affected their operations. Although Plaintiffs were not named parties in that case, there is no doubt that they were closely following its development and involved with the City of Joliet's legal strategies. In addition, Defendants here have conceded that Plaintiffs could have actively participated in the matter. In light of those circumstances, the timing of the filing of this Federal case certainly suggests vexatious and contrived motivations for filing the Federal claims. Accordingly, this favor also weighs in favor of abstention.

Having considered the above factors, the Court concludes that there are exceptional circumstances warranting a stay. At its core, the dispute in both cases depends on the state court's interpretation and enforceability of MOU § XII.B(3). Given the potential of that determination to greatly narrow or eliminate the scope of issues in this case, along with the relative progress of the proceedings and other factors favoring a stay, deference to the State Court Action is appropriate. More broadly, the Court views a stay of these proceedings until the state court issues a final decision on the merits as a sensible case management tool that promotes wise judicial administration. *See GeLab.*, 99 F.4th at 428 n.1.

### III. Remaining Matters

Because the Court has determined that a stay pending resolution of the State Court Action is appropriate, the remaining pending motions are denied without prejudice.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss for lack of jurisdiction [61] is denied, but their motion for a stay [48] is granted. This action is stayed pending resolution of the State Court Action. Plaintiffs' motions for a preliminary injunction [23] and expedited discovery [45] and Defendants' motion to dismiss for failure to state a claim [50] are denied without prejudice.

**DATED**: September 23, 2024	**ENTERED**:

	_____
	LaShonda A. Hunt
	United States District Judge